IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**UNITED STATES OF AMERICA**,

    Plaintiff,

vs.

1.     **ANDRES PEREZ**,

    Defendants.

**Criminal No.**17-10391-RGS

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

ANDRES PEREZ is charged with possessing with intent to distribute cocaine base, including cocaine base which was seized from his anal area. He now seeks to suppress that evidence on grounds that the police lacked reasonable suspicion to stop the Mercedes which he was driving, because they searched the Mercedes in a private driveway, and because they conducted a visual cavity search. These arguments all fail because the police had reasonable suspicion that they had seen the driver of the Mercedes conduct a drug deal; because the automobile exception does apply to PEREZ's car when parked in someone else's driveway; and because the visual body cavity search was supported by reasonable suspicion that PEREZ was hiding drugs. Following a hearing, the court should deny the motion.

I.     FACTS[1]

On October 31, 2017, at approximately 10:30 am, two Revere Police detectives were driving back to the police station in an unmarked car when they noticed an individual on a public street. He stood out to them because he was dressed unseasonably in a t-shirt and shorts and was acting in a noticeably agitated fashion, pacing back and forth on the public street while talking

---

[1] The government anticipates that it will elicit testimony to show the following facts.

on a cell phone, and looking up and down the street as if waiting for someone. Both detectives believed that the man had physical traits consistent with a drug abuser. The street is located in an area right next to two main highways, an area favorable for quick drug transactions as sellers can simply exit the highways and then get directly back on.

The detectives shortly thereafter observed the man walk to a side street. The detectives drove to the end of the side street, and observed the male lean into the passenger window of a brown, two door Mercedes and then immediately walk away. The entire transaction took no more than 15 seconds and the man was actually leaning inside the car for only a few seconds. Although they did not see an actual exchange, based on their experience and all the surrounding facts, the detectives believed that they had just seen a street-level drug deal.

The detectives thereafter followed the Mercedes. They saw the Mercedes travel eastbound on Eustis Street, make a right onto Beach Street, a left on Janvrin Avenue, and a left on Trevalley Road. Trevalley Road ends in a T-intersection at Payson Street, which is a one way street leading directly back to Beach Street, almost exactly where the Mercedes had been a few moments earlier. The detectives believed that the Mercedes was conducting counter-surveillance, which further confirmed their suspicion that the individuals in the Mercedes were engaged in drug dealing.

The detectives conducted a motor vehicle stop just as the Mercedes was approaching Payson Street. The Mercedes pulled into a small driveway off Trevalley Road.[2] PEREZ did not

---

[2] It is unclear whether the Mercedes pulled into the driveway and then the police activated their blue lights or whether the police activated their lights, which caused the Mercedes to pull over. The distinction makes no difference to the analysis.

live in the house and told police that he was there to visit a friend.[3] The vehicle held two individuals. The driver was ANDRES PEREZ and the passenger was Cesar Alicea. During the traffic stop, both detectives observed PEREZ handling two cell phones in a manner consistent with him turning them off, which was consistent with trying to conceal potential drug trafficking evidence by limiting access to the phones by the police.

In response to a request from the detectives, PEREZ identified himself, provided the registration for the vehicle, but said that he did not have a license. One of the detectives conducted a records check and learned that PEREZ's license was revoked and, because PEREZ was going to be arrested for driving without a license, requested a marked unit for backup, which arrived shortly thereafter. The detective asked PEREZ to step out of the vehicle in order to be arrested. PEREZ was pat-frisked by one of the detectives (pursuant to his arrest), and the detective found approximately $269 in various denominations, which was also consistent with street-level dealing.

While PEREZ was being pat-frisked, Alicea suddenly opened the passenger door and fled on foot. The back-up officer chased Alicea to a dead end near a residence. The officer observed Alicea stop at the dead end, take something from the front of his pants, rear back his arm, and throw the object over a fence. The officer believed that the object was round and white. Based on the circumstances, the officer believed the discarded object was a package of drugs. Revere Sergeant Robert Impemba, who is also a FBI TFO (North Shore Gang Task Force), arrived on scene to aid in the search of the backyards where the object had been thrown.[4] The sergeant

---

[3] PEREZ did not provide the last name of the friend or the purpose of the alleged visit. Police later asked a resident if PEREZ had been invited to park there and learned that PEREZ had not; the resident also did not know the friend.

[4] Sergeant Impemba immediately recognized PEREZ, who was sitting in the squad car, as the subject of a prior drug investigation in which he had participated and as an associate of the

found a small, .25 caliber, silver pistol in the backyard of a residence, sticking in the ground as if it had been thrown. The gun had an obliterated serial number and a round in the chamber, with a loaded magazine nearby the gun. Alicea was also arrested.[5]

The detectives called for a K-9 officer to search the vehicle, who arrived after the gun was recovered. The dog alerted to what appeared to be a single rock of crack cocaine – about $40 worth – wrapped in a manner consistent with distribution which was between the driver's seat and driver's door. Officers also recovered multiple cellular telephones and a second license plate from the trunk of the vehicle.[6]

PEREZ and Alicea were brought to the Revere Police Station for booking. Sgt. Impemba was aware that PEREZ and Alicea were associated with the East Side Money Gang and had personally investigated PEREZ for PEREZ for dealing drugs including cocaine base, which investigation included undercover buys from PEREZ. Sgt. Impemba had experience that street drug dealers in general and gang members in particular often hid drugs in their anal areas to avoid detection by the police.

The police, including Sgt. Impemba, believed that PEREZ and Alicea had likely hidden drugs in their anal areas based on the above general experience and the following specific factual circumstances:

1. They had observed what appeared to be a street-level drug deal in which PEREZ or Alicea or both was the source for the drugs;

---

East Side Money Gang, a violent Chelsea street gang. The government introduced evidence at PEREZ's detention hearing that he, and Alicea, were members of the gang.
    [5] Alicea was charged with being a felon in possession in Count Two of the Indictment in this case. Alicea pled guilty to that charge on July 24, 2018, and is awaiting sentencing.
    [6] Revere Police would have conducted an inventory search of the Mercedes prior to towing it, consistent to Department policy.

2. After conducting the drug deal, PEREZ had driven in a manner consistent with counter-surveillance and/or an attempt to hid evidence;

3. PEREZ had taken steps to conceal evidence by manipulating his phones as observed by the officers;

4. PEREZ had money on him consistent with street dealing;

5. Alicea had been armed, which would be consistent with them protecting a cache of drugs in the car;

6. Alicea attempted to conceal evidence by fleeing and throwing the gun away;

7. There was an extra license plate in the vehicle, which was consistent with the concealing drug activity from law enforcement;

8. Officers found crack (wrapped for distribution) on the floor of the vehicle, which would be consistent with dropping drugs as they were hiding them;

9. They had recovered only about $40 worth of drugs, which seemed inconsistent with the circumstances above, especially the presence of the gun; and

10. Officers had a reasonable belief that there should be more drugs in the car than the single rock recovered.

Based on the above, officers had both individuals strip, bend-over, and expose that area of their bodies. Specifically, they instructed PEREZ to place his hands on a desk and bend-over, which exposed his buttocks. Detective Zingali craned his neck and saw something hidden in that area of PEREZ's body. He then removed a clear plastic bag containing numerous other clear plastic baggies of a white, rock-like substance and a brown powdery substance—which appeared to them, based on their training and experience, to be cocaine base and heroin packaged for street-level distribution in multiple small plastic baggies.

II. ARGUMENT

    1. *There Was Reasonable Suspicion For the Stop.*

Police officers are permitted to stop a vehicle based on a "reasonable suspicion" of criminal activity, based on "specific and articulable facts." *United States v. Jones*, 700 F.3d 615,

621 (1st Cir. 2012) (citing *Terry v. Ohio,* 392 U.S. 1, 21 (1968)). While *Terry* typically involves a two-part test to determine first, whether the "initial interference . . . was justified," and second, "whether the ensuing search was reasonabl[e] . . . ," *United States v. Ivery*, 427 F.3d 69, 72 (1st Cir. 2005), the initial stop led almost immediately to the arrest of PEREZ and the subsequent search of the car was justified on separate grounds. Therefore, the real question here is whether the initial stop was justified.

The justification for the initial stop should be viewed through the "totality of the circumstances." *United States v. Campbell*, 741 F.3d 251, 261 (1st Cir. 2013) (citing *United States v. Cortez*, 449 U.S. 411, 417 (1981)). The implication of that lens is that "even innocuous facts, which when taken alone may not be sufficient to create reasonable suspicion, may in combination with other innocuous facts take on added significance." *United States v. Am*, 564 F.3d 25, 30 (1st Cir. 2009) (internal citations omitted). Furthermore, in deciding to make a *Terry* stop, officers are expected to use "their own expertise and specialized training." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). Careful review of the several facts here demonstrated that this traffic stop did not violate the Fourth Amendment and therefore was not unlawful.

Here, the detective reasonably concluded that they had just seen a drug deal, which was sufficient justification for the stop. In this case, the officers had experience with this particular area of Revere and the manner of drug crimes which typically took place there. Specifically, they saw a man who acted consistently with a drug user – frantic, dressed inappropriately, holding a cell phone and looking for someone – lean into a car for about fifteen seconds. Such conduct was entirely consistent with a drug deal. *See United States v. Dubose*, 579 F.3d 117, 121-22 (1st Cir. 2009) ("the fact that [the defendant] leaned his entire upper body into the car during the interaction, and that [the defendant]'s conduct was similar to the conduct involved in

other drug transactions in the area" gave officers reasonable suspicion to stop); *United States v. Trullo*, 809 F.2d 108, 111-12 (1st Cir. 1987) (the police stopped and searched a defendant because they viewed his vehicle engaged in a pattern of movement consistent with a drug transaction in a high-crime neighborhood); *United States v. Rabbia*, 699 F.3d 85, 90 (1st Cir. 2012) (drug related concerns sufficient for *Terry* stop), *citing United States v. Miller*, 959 F.2d 1535, 1539 (11th Cir. 1992) (drug transactions in which "supplier arrived by car, [the customer] got in the car, the car drove around the block during which time the exchange of drugs for money occurred, and then the car returned to the residence and dropped [the customer] off); *United States v. Allah*, 994 F. Supp. 2d 148, 154 (D. Mass. 2014) (finding reasonable suspicion where officer saw a new-looking Chevrolet acting in a manner consistent with drug dealing in a high drug-crime area).

      The police officers' reasonable conclusion is buttressed by additional, relevant facts. The stop occurred in a high-crime area. Presence in a high-crime area, although insufficient on its own, is "clearly a consideration a police officer may use to decide to make a *Terry* stop." *Am*, 564 F.3d at 30 (the defendant's presence in a high-crime area, combined with other factors, was sufficient to justify a stop and pat-down). The defendant was in a recent model Mercedes, a type of vehicle often associated with drug transactions in this area. *See Allah*, 994 F. Supp. 2d at 154 (a new-looking Chevrolet in a high drug crime area); *United States v. Santiago Vega*, 228 F. Supp. 2d 2, 9 (D.P.R. 2002) (reasonable suspicion where a late model black Mercedes Benz SUV in a high crime area contained a defendant behaving suspiciously). Finally, the car appeared to perform counter-surveillance, another factor that supports a conclusion that the occupants had just completed a drug and were engaged in ongoing criminal activity.

2. *The Search of the Mercedes Was Justified, Regardless of Where The Police Stopped PEREZ.*

"The 'automobile exception' to the Fourth Amendment's search warrant requirement provides that '[i]f there is probable cause to believe that a vehicle contains evidence of criminal activity, agents can search without a warrant any area of the vehicle in which evidence may be found.'" *United States v. Mott-Frye*, 251 F. Supp. 3d 310, 315 (D. Mass. 2017), citing *United States v. Polanco*, 634 F. 3d 39, 42 (1st Cir. 2011); *Carroll v. United States*, 267 U.S. 132 (1925). In this case, the long list of factors above, including observations of the drug deal, the counter-surveillance (and opportunity for concealment that it provided), PEREZ's two phones, his attempts to conceal the phones, Alicea fleeing, and Alicea attempting to conceal evidence, all give ample probable cause for the police to search the car. Moreover, the police required no specific exigency to justify the search. *United States v. Panitz*, 907 F.2d 1267, 1271-72 (1st Cir. 1990).

PEREZ argues that the motor vehicle exception to the search warrant requirement "does not extend to a vehicle parked in a public driveway," Def.'s Mem. at 4, citing *Collins v. Virginia*, -- U.S. --, 138 S. Ct. 1663 (2018). *Collins* does not apply to this case. *Collins* presented the question whether the automobile exception to the Fourth Amendment applied within the curtilage of the defendant's home, which included the driveway where the motor vehicle was located.[7] *Id.* at 1669. PEREZ cannot avail himself of the home's curtilage because *it was not his home*. Notably, PEREZ never asserts that he lived there or was even an invited guest. As a result, the heightened protection for the home, which the curtilage seeks to protect, is not

---

[7] *Collins* did not define how far down the driveway the curtilage extends; in the case, the motor vehicle (a motorcycle) was parked at the top of the driveway, next to a side door to the house. *Id.* at 1671. Because PEREZ has no Fourth Amendment interest in the curtilage of the house where he parked, it does not matter where in the driveway he parked.

8

implicated here. In other words, PEREZ lacks standing to make this argument. *See id.*, 1668 fn. 1.

This case is controlled by *United States v. Goncalves*, where the First Circuit affirmed application of the motor vehicle exception to a search of the defendant's car parked in a private driveway (the defendant's mother's) and unoccupied by anyone who might drive it away. 642 F.3d 249, 251 (1st Cir. 2011). The Court declined to create a *per se* rule against warrantless searches in a driveway. *Id.*; *see also United States v. Moscatiello*, 771 F.2d 589, 599-600 (1st Cir. 1985) (upholding search of automobile parked in a private driveway, not the defendant's driveway, after police had pursued the automobile into the driveway), *vacated on other grounds by Murray v. United States*, 487 U.S. 533 (1988).

The search of the Mercedes was also justified as an inventory search. Inventory searches "are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). These searches are "justified based on community caretaking functions, including, for example, the protection of property, the flow of traffic, and the safety of the public and police." *United States v. Mensah*, 796 F. Supp. 2d 265, 268 (D. Mass. 2011) (citations omitted). Inventory searches are permissible under the Fourth Amendment where police have lawfully impounded the defendant's vehicle and the search is carried out pursuant to a reasonable, standardized policy. *South Daktoa v. Opperman*, 428 U.S. 364, 372 (1976).

Here, both PEREZ was arrested,[8] as well as Alicea, leaving no one to drive the car. "Case law supports the view that where a driver is arrested and there is no one immediately on

---

[8] Having legally stopped PEREZ, the police were entitled to ask him to present identification, from which interaction they learned the PEREZ was driving illegally, which was a criminal offense. "[O]fficers may order the driver and any passengers to get out of the car until

9

hand to take possession, the officials have a legitimate non-investigatory reason for impounding the car." *United States v. Coccia*, 446 F.3d 223, 240, n. 7 (1st Cir. 2006) (citing *Vega-Encarnacion v. Babilonia*, 344 F.3d 37, 41 (1st Cir. 2003)). In fact, the Mercedes was blocking the driveway, which was another reason why the car had to be towed. In connection with the towing, it was the practice of the Revere police to conduct an inventory search.

        3.      *The Visual Body Cavity Search Was Justified.*

In the first place, probable cause is not needed to perform a strip or visual body cavity search performed pursuant to a lawful arrest. *Swain v. Spinney*, 117 F.3d 1, 5-7 (1st Cir. 1997). All the police must do is show that they had "reasonable suspicion that the arrestee was concealing contraband or weapons" in the areas being searched. *Swain*, 117 F.3d at 6. Relevant factors include the nature of the offense, the items that are the object of the search, and the likelihood these items may be so concealed. The inquiry is a practical one, calling for a "sensible assessment of the circumstances." *United States v. Cofield*, 391 F.3d 334, 336-37 (1st Cir. 2004). *See generally Bell v. Wolfish*, 441 U.S. 520, 559 (1979) (reasonableness of an intrusive search requires consideration of "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted").

In drug cases, strip searches are *per se* justified because "[i]t is common knowledge that controlled substances often are concealed on the person of users and dealers alike." *Burns v. Loranger*, 907 F.2d 233, 238-39 (1st Cir. 1990). *See also United States v. Barnes*, 506 F.3d 58, 62 (1st Cir. 2007) ("The initial strip search for contraband and weapons was clearly justified given Barnes's arrest for a drug trafficking crime"); *United States v. Doutre*, 2009 WL 1211048

---

the traffic stop is complete." *United States v. Fernandez*, 600 F.3d 56, 59 (1st Cir. 2010) (citing *Maryland v. Wilson*, 519 U.S. 408, 415 (1997)).

(D. Mass. 2009) (Saris J.) ("Because Doutre was arrested for a drug trafficking crime, the police were justified in conducting a strip search").

In this case, the police executed a visual bodily cavity search. "[A]lthough sometimes varying in labels, courts tend to distinguish between (1) a simple strip search involving removal of all or virtually all clothes, (2) a visual inspection of genitals or buttocks requiring some change in posture of the body (for example, the subject might be forced to bend over and spread his buttock cheeks), and (3) an actual manual intrusion into such orifices." *United States v. McGhee*, 627 F.3d 454, 457 (1st Cir. 2010), *on reh'g*, 651 F.3d 153 (1st Cir. 2011). When the search extends to body cavities, more than the simple fact of a drug arrest is required. *Barnes*, 506 F.3d at 62 (requiring a "more particularized suspicion that contraband is concealed" to justify visual body cavity search); *Swain*, 117 F.3d 1, 7 (1st Cir.1997) ("[T]he reasonable suspicion standard governs strip and visual body cavity searches in the arrestee context...."). The suspicion must also be specific to the individual being searched. *Roberts v. Rhode Island*, 239 F.3d 107, 110 (1st Cir. 2001) ("[O]fficers [must] have a reasonable suspicion that a particular detainee harbors contraband prior to conducting a ... visual body cavity search."). *See also Hunter v. Auger*, 672 F.2d 668, 675 (8th Cir.1982) (strip and visual body cavity search required reasonable suspicion that "drugs or other contraband are concealed in the particular place [prison officials] decide to search"); *Kraushaar v. Flanigan*, 45 F.3d 1040, 1046 (7th Cir.1995) (holding search reasonable where defendant made gestures as if attempting to hide something in his pants).[9]

---

[9] The cases also require consideration of the manner in which the search is conducted, with attention to whether it exceeds reasonable bounds or is done in a needlessly humiliating fashion or with improper motivation. *E.g.*, *Roberts v. Rhode Island*, 239 F.3d 107, 113 (1st Cir. 2001); *Swain*, 117 F.3d at 8. There are no such concerns here.

11

Application of these principles here show that the search was reasonable. The police reasonably believed that PEREZ was dealing drugs, which his known criminal history confirmed; they were aware that Alicea had possessed a gun, which suggested they may have possessed a large quantity of drugs in need of protection; in contrast, they had found only a very small quantity of drugs; they were aware that PEREZ engaged in counter-surveillance, which would have provided an opportunity to secrete drugs; they saw PEREZ attempting to hide his phones and Alicea attempting to dispose of evidence; and they were generally aware that gang members, including ESMG members, concealed drugs in their anal areas. *E.g.*, *Cofield*, 391 F.3d at 336-37 (upholding strip search of arrestee who had pending heroin and armed assault charges and whose had a bag of heroin in his pocket); *United States v. Logan*, 219 Fed. Appx. 293 (7th Cir. 2007) (upholding strip search of individual arrested for drug possession who had recently sold drugs to an undercover agent and where police had recovered two bags of marijuana and a bag of crack from defendant's car and person).[10]

---

[10] Removing the plastic baggie, once observed, did not constitute a manual bodily cavity search. *See, e.g., United States v. Gray*, No. Cr. 10-10075-PBS, 2010 WL 5128369, at *3 (D. Mass. Dec. 10, 2010).

III. CONCLUSION

For the reasons discussed above, the government respectfully requests that the Court deny defendant's motion to suppress.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By: /s/ Timothy E. Moran
TIMOTHY E. MORAN
MICHAEL J. CROWLEY
Assistant U.S. Attorneys

Date: August 1, 2018

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Timothy E. Moran
TIMOTHY E. MORAN
Assistant United States Attorney

Date: August 1, 2018