UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL ACTION NO. 17-10391-RGS

UNITED STATES OF AMERICA

v.

ANDRES PEREZ

MEMORANDUM AND ORDER ON
DEFENDANT'S MOTION TO SUPPRESS

January 11, 2019

STEARNS, D.J.

On October 31, 2017, defendant Andres Perez was stopped by Revere police after being observed engaged in what officers believed to be a drug transaction. He now moves to suppress the warrantless seizure of drugs from his Mercedes vehicle and later from his person during a search incident to booking. He also challenges the initial stop by police, arguing that they lacked the reasonable suspicion necessary to justify the infringement of his Fourth Amendment rights. An evidentiary hearing on the motion was held on October 31, 2018, and, at counsels' request, supplemental memoranda were filed based on the testimony and exhibits presented at the hearing.

Based on the credible testimony and exhibits, I find the following material facts.

1.  On the morning of October 31, 2017, Lt. Maria Lavita and Det. Douglas Zingali, seasoned Revere officers with 43 years of police work

between them, were on patrol in an unmarked cruiser on Harris Street near Route 1A in Revere, Massachusetts.

2. The officers observed an unidentified male pacing nervously on Harris Street while speaking on a cell phone. The officers' attention was drawn by the fact that the man appeared inappropriately dressed (in shorts and a T-shirt) on a late fall day.

3. As the officers watched, the man walked north on Harris and turned right on Eustis Street. As he stood at the front of 27 Eustis Street, a two-door Mercedes pulled up. The man leaned into the passenger window of the Mercedes and then 10 or 15 seconds later walked away. Suspecting that a sale of drugs had just taken place, the officers decided to follow the Mercedes.

4. The Mercedes proceeded up Eustis, turning right on Cary Avenue, and a block later right onto Beach Street. The Mercedes drove one block on Beach before turning left on Janvrin Avenue. A block later, the Mercedes turned left on Trevalley Road. As the Mercedes approached Payson Street, Det. Zingali activated the cruiser's siren and blue lights. The Mercedes then pulled into a driveway at 55 Payson Street where it came to a stop.[1] Det. Zingali parked his cruiser behind the Mercedes, effectively blocking the driveway. The officers then observed the driver and passenger exchange

---

[1] Both Lt. Lavita and Det. Zingali testified that the Mercedes otherwise drove normally and that they observed no traffic violations.

cell phones.

5. Det. Zingali exited the cruiser and approached the driver's side of the Mercedes, while Lt. Lavita went to the passenger side. Det. Zingali asked the driver, who identified himself as Andres Perez, for his license and registration. Perez produced the registration, but stated that he did not have his license with him. When asked why he had pulled into the driveway, Perez said that he was visiting a friend for whom he gave a name.[2] Upon running Perez's name through his dispatch center, Det. Zingali learned that his driver's license had been revoked. Det. Zingali then placed Perez under arrest for operating after revocation. Meanwhile, Lt. Lavita asked the passenger, later identified as Cesar Alicea, to write down his name and date of birth on a sheet of paper. Lt. Lavita returned to the cruiser to "run" Alicea's name.

6. A uniformed officer, Sgt. Rose, responding to the call for backup, then arrived at the scene in a marked cruiser. Det. Zingali then ordered the driver, defendant Andres Perez, to step out of the Mercedes. As he did so,

---

[2] Det. Zingali later spoke to occupants of the house who stated that the Mercedes did not belong to anyone in the house, nor did any occupant identify himself by the name Perez had given. Perez, in his affidavit in support of the motion to suppress, offers no information about the house or its occupants.

3

Alicea jumped out of the passenger seat and ran down Trevalley Road with Lt. Lavita and Sgt. Rose in pursuit. As Sgt. Rose chased after Alicea, he observed him throw an object over a neighboring fence. After Alicea was caught and arrested, Det. Lt. Robert Impemba, who had also responded as backup, found a loaded .25 caliber semiautomatic firearm in a vegetable garden in the area where Alicea had thrown the object.

7. After Perez and Alicea were transported from the scene by uniformed officers, Lt. Lavita and Det. Zingali called for a K-9 unit. The narcotics dog alerted to a baggie containing a white substance on the floor of the driver's side of the Mercedes. Once the dog had completed a sniff search, the officers seized the baggie and searched the car. No other drugs were found. However, a revoked license plate was seized from the trunk of the vehicle.

8. At the Revere police station, Perez was booked by Lt. Impemba, the supervisor of the Narcotics and Gang Unit and a member of the FBI's North Shore Gang Task Force. Lt. Impemba had been one of the backup officers responding to Payson Street. Det. Zingali and a uniformed officer were also present. During the booking, $269 in various denominations was retrieved from one of Perez's pockets. Three cell phones were also seized.

Lt. Impemba believed that, as a known narcotics distributor, Perez would have more drugs in his possession than the single baggie found in the Mercedes and that these drugs were likely concealed on his person. Lt. Impemba ordered Perez to lower his pants and underwear and bend over at his waist. When, after some initial hesitation he did so, Det. Zingali observed a clear plastic baggie protruding from his butt cheeks. Det. Zingali removed the baggie from the buttocks area with a gloved hand and without touching Perez's person. The baggie was found to contain 10 smaller baggies of crack cocaine and three baggies of heroin.

9. The Revere Police Department has no written policy governing strip searches.

## RULINGS OF LAW

1. "The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Adams v. Williams*, 407 U.S. 143, 145-146 (1972). "Based upon [the] whole

picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-418 (1981). A combination of suggestive circumstances, largely innocent in and of themselves, when considered in their totality, may constitute the "reasonable suspicion" necessary to justify a *Terry* stop. *United States v. Sokolow,* 490 U.S. 1, 9 (1989). In the same vein, conduct that would likely be perceived as innocent by a casual onlooker may in the totality of the circumstances appear suspicious to a trained and experienced police officer. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). As is true in the case of an arrest, facts must be assessed considering the collective knowledge of the officers involved. *United States v. Hensley*, 469 U.S. 221, 232 (1985); *United States v. Cook*, 277 F.3d 82, 86 (1st Cir. 2002).

2. *Carroll v. United States*, 267 U.S. 132, 158-159 (1925), carved an "automobile exception" out of the Fourth Amendment's warrant requirement. *Carroll* recognized the exigency inherent in vehicular mobility as well as the impracticalities involved in obtaining a warrant after a vehicle is stopped. *Id.* at 153; s*ee also Cardwell v. Lewis*, 417 U.S. 583, 590-591 (1974) (*plurality opinion*). *Carroll* does not, however, give police

the unbridled authority to conduct warrantless searches of vehicles no matter where they are found.  Because "the scope of the automobile exception extends no further than the automobile itself," the Fourth Amendment prohibits the warrantless search of a vehicle parked within the curtilage of a defendant's home.  *Collins v. Virginia*, 138 S. Ct. 1663, 1671 (2018).  In *Collins*, the defendant had parked his stolen motorcycle in a partially enclosed section of the driveway next to a side door of the house. The officer accused of an illegal search walked up the driveway to the enclosed area, removed a tarp covering the motorcycle, and took down the motorcycle's license plate and vehicle identification numbers. Justice Sotomayor, joined by seven other Justices, readily concluded that any expansion of the vehicle exception that would permit an officer to conduct a warrantless search (without more) "would both undervalue the core Fourth Amendment protection afforded to the home and its curtilage and '"untether"' the automobile exception '"from the justifications underlying it."' *Id.*, quoting *Riley v. California*, 134 S. Ct. 2473, 2485 (2014). While the issue was not addressed directly in *Collins* (Virginia had conceded that Collins had a reasonable expectation of privacy in the home – which belonged to his girlfriend and where he was a regular guest), it is clear from

the distinction Justice Sotomayor makes of *Pennsylvania v. Labron*, 518 U.S. 938 (1996) (*per curiam*), that the Court would not afford standing to a person who was a stranger to the property where the vehicle was parked. *Collins,* 138 S. Ct. at 1674.

3. In *Arizona v. Gant*, 556 U.S. 332 (2009), the Supreme Court significantly narrowed the holding in *New York v. Belton*, 453 U.S. 454, 460 (1981).[3] The Court took special note of the two justifications for a search incident to arrest that were set out in *Chimel v. California*, 395 U.S. 752 (1969), namely preventing an arrestee from obtaining possession of a weapon or destroying evidence within his reach. Justice Stevens, writing for the Court, observed that "[i]f there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search, both justifications for the search-incident-to-arrest exception are absent and the [*Chimel*] rule does not apply." *Id.* at 339. Otherwise, "a vehicle search would be authorized incident to every arrest of a recent occupant notwithstanding that in most cases the vehicle's passenger compartment will not be within the arrestee's reach at the time of the search." *Id.* at 343. The

---

[3] *Belton* had been widely thought to set out a "bright-line" rule permitting a thorough search of the entire passenger compartment of a vehicle as an incident to an occupant's arrest.

8

Court did, however, allow an exception: "[W]e also conclude that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" *Id.*, quoting Justice Scalia's concurrence in *Thornton v. United States*, 541 U.S. 615, 632 (2004).

4. A full search of the person, his effects, and the area within his immediate reach or control may be conducted incident to a lawful custodial arrest, without regard to any exigency or the seriousness of the offense, and regardless of any probability that the search will yield a weapon or evidence of the crime for which the person is arrested. *See United States v. Robinson*, 414 U.S. 218, 235 (1973) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no further justification."); *Gustafson v. Florida*, 414 U.S. 260, 263-264 (1973) (same). There are two rationales for the search incident to arrest exception: (1) the need to protect officer safety by insuring that a person being taken into custody is not in possession of any weapon; and (2) the need to preserve evidence for later use at trial. *Robinson* at 234. When a person is lawfully arrested, "searches and seizures that could be made on the spot at the time

9

of arrest may legally be conducted later when the accused arrives at the place of detention." *United States v. Edwards*, 415 U.S. 800, 803 (1974).

5. Searches of persons jailed after arrest, including strip searches and visual body cavity searches, may be conducted with less than probable cause if the search is reasonable in scope, manner, and purpose. *Bell v. Wolfish*, 441 U.S. 520, 558-560 (1979). "[T]o be reasonable under [*Bell*], strip and visual body cavity searches must be justified by at least a reasonable suspicion that the arrestee is concealing contraband or weapons." *Swain v. Spinney*, 117 F.3d 1, 7 (1st Cir. 1997); *cf. Roberts v. Rhode Island*, 239 F.3d 107, 112 (1st Cir. 2001) ("The reasonable suspicion standard may be met simply by the fact that the inmate was charged with a violent felony."). In an institutional setting, as a general rule no suspicion at all is required with respect to detainees. *See Powell v. Barrett*, 541 F.3d 1298, 1307 (11th Cir. 2008) (*en banc*) ("The *Bell* decision, correctly read, is inconsistent with the conclusion that the Fourth Amendment requires reasonable suspicion before an inmate entering or re-entering a detention facility may be subjected to a strip search that includes a body cavity inspection."); *see also Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 336-338 (2012) (affirming a county jail policy of requiring all arrestees who are to be placed in the general jail

population to undergo non-invasive visual strip searches as a security precaution); *Bame v. Dillard*, 637 F.3d 380, 386 (D.C. Cir. 2011) ("[N]othing in *Bell* requires individualized reasonable suspicion before strip searching a person entering a detention facility."); *Bull v. City and Cnty. of San Francisco*, 595 F.3d 964, 977 (9th Cir. 2010) (*en banc*) (upholding a policy of blanket strip searches of all arrestees upon their admission to the general jail population).

CONCLUSIONS OF FACT AND LAW

1. The initial stop of Perez's vehicle was justified by the observation of behavior that an experienced officer would have reasonably recognized as consistent with a drug transaction, specifically: (a) an agitated man inappropriately dressed for the weather pacing on a public street while speaking on a cellular phone; (b) who, after several minutes of pacing and talking, walked around the street corner where he approached a Mercedes vehicle idling in the middle of the street, having come from the direction of Route 1A; (c) the man then leaned into the passenger window for 10 or 15 seconds and then walked away. *See United States, v. Dubose*, 579 F.3d 117, 121-122 (1st Cir. 2009) (the fact that defendant leaned his entire upper body into the suspect car gave rise to an inference of drug dealing);

11

*Commonwealth v. Kennedy*, 426 Mass. 703, 709 (1998) (The "quickness of the interaction . . . reasonably could be interpreted by the officer as suspicious conduct."). The inference was further buttressed by the unusual and circuitous route that the Mercedes took while driving away from the scene, a route that an experienced officer would have recognized as consistent with countersurveillance and/or an attempt to evade police. *See Florida v. Rodriguez*, 469 U.S. 1, 6 (1984) (Defendant's "strange movements in his attempt to evade the officers aroused further justifiable suspicion."); *see also Commonwealth v. Mendez*, 476 Mass. 512, 517-518 (2017) (finding justifiable suspicion where, after a quick pick up and hasty exit from a public housing complex near the scene of a fatal shooting, the vehicle in which defendants were riding followed a meandering "serpentine route" through the city with no apparent destination in mind).

2. Because Perez has made no claim of an ownership interest in the home at 55 Payson Street or status in the home as a social or overnight guest, *see Minnesota v. Olson*, 495 U.S. 91, 99-100 (1990), the limitation on the warrantless search of vehicles incident to arrest set out in *Collins* does not apply. *See United States v. Cruz Jiminez*, 894 F.2d 1, 5 (1st Cir. 1990) (the defendant bears the burden of proving that he had both a subjective and

objectively reasonable expectation of privacy in property searched or things seized).

3. Having lawfully stopped the Mercedes, police had the right to ask the driver (Perez) for identifying information, including his license and registration. *See Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S. 177, 188-189 (2004); *see also United States v. Fernandez*, 600 F.3d 56, 62 (1st Cir. 2010) (noting that where a stop involves an automobile, the prevailing view holds that officers may ask passengers as well as the driver for identification). Police also had statutory authority to arrest Perez once it was determined that his right to operate a vehicle had been revoked. *See* Mass. Gen. Laws ch. 90, § 21.

4. The ensuing search of the Mercedes was lawful on one, and possibly two, separate grounds. Turning first to the search incident to arrest exception, based on what the officers had observed prior to the stop, they had reasonable suspicion, as *Gant* requires, that drugs would be found in the vehicle. However, Justice Stevens in *Gant*, appeared to limit the search of a vehicle incident to arrest to evidence "relevant to the crime of arrest."[4] 556 U.S. at 343 (citation omitted). While a case can be made

---

[4] It is readily apparent that the search of the vehicle would not uncover

against a literal construction of *Gant*, of greater moment, police here had probable cause to conduct a warrantless *Carroll* search of the Mercedes. In addition to the facts that gave rise to a reasonable suspicion for the initial stop, by the time of the search added to the equation were: (a) Lt. Impemba's knowledge of Perez's reputation as a dealer in drugs, *see United States v. Am*, 564 F.3d 25, 30 (1st Cir. 2009); (b) Alicea's headlong and unprovoked flight from the scene, *see Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (holding that defendant's unprovoked flight, coupled with his presence in an area of heavy narcotics trafficking, justified the suspicion that he was engaged in criminal activity); and (c) the alert of the K-9 narcotics dog to the presence of drugs in the Mercedes, *see Illinois v. Caballes*, 543 U.S. 405, 409-410 (2005).

5. The search of Perez incident to booking was lawful, including the strip and visual body cavity search of his person. A detainee who is jailed pursuant to a valid arrest, regardless of the nature or degree of the crime, may be subjected to a visual body cavity search on reasonable suspicion (or

---

evidence of operating after revocation, the crime for which Perez was formally arrested.

less).[5]  *See Florence*, 566 U.S. at 336-338.  This rule has special force in the case of drug arrests, as "[i]t is common knowledge that controlled substances are often concealed on the persons of users and dealers alike."  *Burns v. Loranger*, 907 F.2d 233, 238-239 (1st Cir. 1990).

6.   That the Revere Police Department had no written policy governing the strip searches of arrestees is of no Fourth Amendment significance.  *See Durand v. Harpold*, 807 F.3d 392, 394 (1st Cir. 2015) (holding that an alleged violation of a state civil commitment statute could not support a Fourth Amendment claim of unreasonable seizure); *Boveri v. Town of Saugus*, 113 F.3d 4, 7 (1st Cir. 1997) ("A regulatory violation, like a violation of state law, is not inherently sufficient to support a § 1983 [due process] claim."); *White v. Olig*, 56 F.3d 817, 821 (7th Cir. 1995) ("[F]ailure to follow procedures mandated by state but not federal law . . . can establish only a state law violation.").

ORDER

---

[5] While a more heightened showing may be required where such a search involves a manual intrusion into an arrestee's anal or genital cavities or where the search is conducted in a public or humiliating fashion (the case law is inconsistent), neither circumstance applies here.

For the foregoing reasons, Perez's motion to suppress is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns

_____
UNITED STATES DISTRICT JUDGE